## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:05CV267-H

TC ARROWPOINT, L.P.,    )
   )
       **Plaintiff,**    )
   )
vs.    )        <u>**MEMORANDUM AND ORDER**</u>
   )            <u>**AND JUDGMENT**</u>
CHOATE CONSTRUCTION CO.,)
   )
       **Defendant.**    )
_____)

**THIS MATTER** is before the Court on the following motions and memoranda:

1. The Plaintiff's "Application for Confirmation of Arbitration Award" (document #1) filed June 8, 2005;

2. The Defendant's "Motion to Vacate Arbitration Award" (document #15) filed August 3, 2005;

3. Plaintiff's "Reply in Support of its Application for Confirmation of Arbitration Award and ... Opposition to Defendant's Motion to Vacate" (document #25) filed September 2, 2005;[1]

4. Defendant's "Brief in Support of Motion to Vacate ..." (document #31) filed October 7, 2005;

5. Plaintiff's "Response in Opposition to Motion to Vacate ..." (document #34) filed November 1, 2005;

6. Defendant's "Reply in Support of Motion to Vacate ..." (document #35) filed November 15, 2005;

---

[1] Although styled as a "Reply," the Plaintiff's September 2, 2005 filing was, in fact, the first brief filed by either party in support of their respective cross motions to confirm/vacate the subject arbitration award.

7. Plaintiff's "Motion to Strike Defendant's Reply" (document #36) and "Memorandum in Support ... " (document #37), both filed November 17, 2005;

8. "Defendant's Brief in Response to Motion to Strike" (document #38) filed November 17, 2005;

9. Plaintiff's "Sur-reply in Response to [Defendant's] Reply Brief" (document #39) filed November 29, 2005; and

10. Defendant's "Sur-reply in Support of Motion to Vacate" (document #40) filed December 15, 2005.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and the parties' cross motions are now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendant's "Motion to Vacate Arbitration Award" (document #15), <u>grant</u> the Plaintiff's "Application for Confirmation of Arbitration Award" (document #1), and <u>enter</u> Judgment in the Plaintiff's favor, as discussed below.

## I. <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

This is an action pursuant to the Federal Arbitration Act ("FAA") to confirm or vacate an Arbitration Award entered in favor of the Plaintiff on June 2, 2005, in the amount of $13,911,321.05, by a unanimous, three-member Arbitration Panel.

Plaintiff TC Arrowpoint, L.P., a Texas limited partnership, has one general partner, Trammell Crow Arrowpoint, Inc., a Delaware corporation headquartered in Texas. Both TC Arrow point, L.P. and Trammel Crow Arrowpoint, Inc. are affiliates of the Trammel Crow Company, a national full-service real estate development firm headquartered in Dallas, Texas. TC Arrowpoint

L.P.'s single limited partner is Cardinal Arrowpoint, LLC, a Delaware limited liability company maintaining its headquarters in California. Cardinal Arrowpoint's sole member is the Board of Trustees ("Board') of the Leland Stanford Junior University ("Stanford"), and none of the individual members of the Board are citizens of Georgia.

The Defendant, Choate Construction Co., is a general contracting firm located in Atlanta, Georgia, with regional offices located in Savannah, Georgia; Charlotte, North Carolina; Raleigh, North Carolina; and Charleston, South Carolina.

On September 10, 1999, Trammell Crow Arrowpoint, Inc. and the Defendant entered into a "Standard Form of Agreement Between Owner and Contractor, AIA document A101" ("the Contract") for the construction of two office buildings ("the Project"), each consisting of 215,077 square feet, and two above-ground 816-car parking garages, to be built in Charlotte, North Carolina for an approximate contract price of $28 million and to be occupied by Microsoft Corporation.

On December 31, 1999, Trammel Crow Arrowpoint, Inc. assigned the Contract to the Plaintiff, TC Arrowpoint, L.P., although the Defendant contends that it was unaware of the assignment until May 12, 2003, when the Plaintiff filed its Demand for Arbitration, discussed below.

As the Plaintiff points out in its briefs, it is clear that Trammel Crow Arrowpoint, Inc. and the Defendant contemplated that either of them might assign their interest in the Contract, that is, the Contract expressly provides that:

> The Owner and Contractor respectively bind themselves, their partners, successors, <u>assigns</u> and legal representatives to the other party hereto and to partners, successors, <u>assigns</u> and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents.

Paragraph 13.2.1, Exhibit 7 to Plaintiff's Appendix to "Reply in Support of its Application for

Confirmation of Arbitration Award and ... Opposition to Defendant's Motion to Vacate" (document #25) (emphasis added).[2]

Rather than stating that an assignment made without the consent of the other party would be void, Paragraph 13.2.1 of the Contract provided only that if either party assigned its interest without the express consent of the other party, the assigning party would "remain legally responsible for all obligations under the Contract." Id.

There is no evidence, however, that Trammell Crow Arrowpoint, Inc. attempted to avoid its obligations under the Contract or that the Plaintiff, as assignee, has failed to perform its obligations under the Contract. To the contrary, the Plaintiff alleges, and the Defendant does not presently dispute, that the Plaintiff has paid all sums due under the Contract and that the Defendant recorded a $3.6 million profit on the Project.

Despite the fact that it contends that it did not become aware of the assignment until three years later, the Defendant now maintains that it was prejudiced because the assignment "inject[ed] new ... owners and decision-makers with whom [the Defendant] had never worked" and allegedly created an atmosphere where it became difficult to "resolv[e] disputes amicably." Defendant's "Brief in Support of Motion to Vacate ..." at 5 (document #31).

During the time the Project was underway, however, the Defendant treated TC Arrowpoint, L.P. and Trammel Crow Arrowpoint, Inc., along with their corporate parent, Trammel Crow Company, interchangeably as "the Owner." At the subsequent arbitration hearing, Shannon Harris, the Defendant's Project Manager who had responsibility for preparing the Defendant's applications for progress payments under the Contract, testified that those applications were submitted to

---

[2]Subsequent references to the Plaintiff's Exhibits shall be noted as "Plaintiff's Exhibit #."

"Trammel Crow Company," because that is the company whom the Defendant believed to be "the Owner," and that Ms. Harris never had any contemporaneous concern or knowledge as to which Trammel Crow entity, in fact, made the progress payments or was a party to the Contract.

Similarly, David Priester, one of the Defendant's co-owners who was directly involved in the Project, testified that concerning the Defendant's contacts with "the Owner," it was important to him only that he work with Don Deutsch, one of Trammel Crow Company's managing directors, and David Featherston, a Trammel Crow Company employee, both of whom worked on the Project before and after Trammel Crow Arrowpoint, Inc. assigned the Contract to TC Arrowpoint, L.P. Mr. Priester admitted that he never asked whether Mr. Deutsch or Mr. Featherston were employed by Trammel Crow Arrowpoint, Inc. or TC Arrowpoint, L.P.

It is undisputed that the Contract also contained an arbitration provision, stating:

> Any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof ...

Paragraph 4.5.1, Plaintiff's Exhibit 7.

The Contract contained an express warranty as well, whereby the Defendant promised that:

> materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.

Paragraph 3.5.1, Plaintiff's Exhibit 7.

Moreover, the Defendant agreed to:

promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed... [and to] <u>bear the costs of correcting such rejected Work, including additional testing and inspections for the Architect's services and expenses made necessary thereby</u>.

Paragraph 12.2.1, Plaintiff's Exhibit 7 (emphasis added).

According to the Contract, the exterior wall panels of both buildings were to be constructed of a material known as Jaramite, which is manufactured on a custom basis pursuant to a proprietary specification patented by the Defendant's material supplier, Architectural Products, Inc. ("API"), located in Manassas, Virginia. On this Project, the Jaramite served not merely as a decorative, cladding material, but also as a load bearing part of the exterior wall system, transferring both gravity and lateral loads.

The Plaintiff decided to use Jaramite based on the recommendations of both the Defendant and the Project Architect, David Herring, and only after obtaining their confirmation that Jaramite was a suitable application for the Project. Although the Jaramite panels ultimately failed due to faulty manufacturing, the Defendant's structural engineering expert, L.G. Lewis, Jr., testified during the subsequent arbitration hearing that "in [his] judgment, if the panel[s] had been properly manufactured, the panels today would be performing satisfactorily." Plaintiff's Exhibit 1, Vol. 7, at 1701.

Accordingly, the Defendant subcontracted with API to design and fabricate all of the Jaramite panels needed for the Project and to design the connections of the panels to the Buildings. Under the terms of the subcontract, "[a]ll costs associated with furnishing [the Jaramite and] ... engineering ... [we]re included in the subcontract amount." Plaintiff's Exhibit 14. Because API was not licensed to perform engineering design services in North Carolina, and on the Defendant's recommendation, API retained Richard Kapp of Professional Engineering Services, Inc. ("PEA") to assist it in

designing both the Jaramite panels and the connection details.

Under the terms of the Contract, the Defendant was responsible "for the acts and omissions of [its] employees, subcontractors and their agents and employees," and at the arbitration hearing, all of the Defendant's Project personnel who testified acknowledged that the Defendant knew that its subcontractor API, rather than the Plaintiff, was responsible for the proper design and fabrication of the Jaramite panels.[3]

The testimony of the <u>Defendant's witnesses</u> on this issue was confirmed by Mr. Herring, who testified that the Defendant, through API, and its design engineer, Mr. Kapp, had the responsibility for designing the Jaramite panels and the connections. <u>See</u> Plaintiff's Exhibit 1, Vol. 3, at 661-62.

For the purposes of this proceeding, the Defendant does not dispute that defective design and manufacture of the Jaramite panels caused them to fail, that is, to suffer widespread cracking. Indeed, at the arbitration hearing, the Defendant's then-counsel stipulated that the manufacturing defects in the Jaramite panels caused them to crack, stating "[h]ere is what we say. We believe that manufacturing deficiencies caused the cracks." Plaintiff's Exhibit 1, Vol. 3, at 648.

On May 12, 2003, the Plaintiff filed a Demand for Arbitration with the American Arbitration Association ("AAA") alleging that the Defendant materially breached the Contract by failing to (1) furnish materials and equipment "of good quality," (2) provide work that was "free from defects not inherent in the quality required or permitted," and (3) provide work that conforms with the requirements of the Contract, and alleging damages of approximately $18 million.

Although the Defendant now contends that the Plaintiff, as an assignee of rather than a

---

[3]These witnesses included Mr. Priester, Ms. Harris, Jeff Miller, the Defendant's Assistant Project Manager and Assistant Superintendent for the Project, and Steve Haggard, the Defendant's Senior Project Manager. <u>See</u> Plaintiff's Exhibit 1, Vol. 4, at 1002:6-10, Vol. 1, at 183:13-19, Vol. 6, at 1492:2-5 <u>and</u> 1492:17-1493:10.

signatory to the Contract, was not entitled to enforce the arbitration clause in the Contract, it is undisputed that the Defendant never applied to this or any court for a stay of the arbitration proceeding. Moreover, even though it did raise a general objection, stated both in its "Response" to the Plaintiff's Demand for Arbitration and its subsequent "Prearbitration Brief," that the parties' dispute was not "arbitrable," the Defendant never raised the question of whether the Panel or a court was to resolve the issue of arbitrability. <u>See</u> Defendant's Exhibit 3 at "Affirmative Defense 1" and Paragraphs 6 and 38, and Exhibit 4 at pages 1, 4, 18-20, both attached as "Appendi[ces]" to Defendant's "Brief in Support of Motion to Vacate ..." (document #31).[4]

Rather, pursuant to AAA procedures, the parties jointly selected the Arbitration Panel Chairman, Howard Goldberg, a construction attorney with more than 30 years of experience in the construction industry. Since 1987, Mr. Goldberg has served as the general counsel of the American Institute of Architects, in which he is also an honorary member, and has served on numerous arbitration panels during his career.

Each party then unilaterally selected another arbitrator. The Defendant selected Harry L. Mashburn, the Chairman and CEO of the general contracting firm, Mashburn Construction, located in Greenville, South Carolina. Mr. Mashburn currently serves as the National Vice President of the Associated General Contractors of America, the largest trade association of general contractors in the country. The Plaintiff selected Atul Patel, AIA, an architect from Washington, D.C., with over 30 years of experience in the construction industry.

Prior to the commencement of the Arbitration Hearing, the parties conducted extensive discovery, including the exchange of more than 30 boxes of documents containing all Project

---

[4]Subsequent references to the Defendant's Exhibits shall be noted as "Defendant's Exhibit #."

records, the identification of expert witnesses along with a summary of their opinions, and the taking of 18 depositions, including each party's principal fact witnesses and structural engineering experts.

On March 1-4 and 7-8, 2005, the Panel conducted a hearing on the merits in Charlotte, North Carolina (the "First Hearing"). On March 1, 2005, Plaintiff's counsel presented an opening statement. The Defendant's counsel deferred his opening statement until the presentation of the Defendant's case-in-chief.

During presentation of its evidence, the Plaintiff called seven witnesses: Ms. Harris, Mr. Priester, Mr. Deutsch, Phillip Sharff, the Plaintiff's structural engineering expert, John Parker, a principal with Kennedy Associates Real Estate Counsel, who advises the Board of Trustees of Stanford University on its real estate investments, William Heaner, an estimator with Western Construction Group, who provided an independent bid of $18.4 million for repairing the Jaramite panels and the connections of the panels to the buildings; and Mr. Herring, the Project Architect. The Panel imposed no restrictions or time limitations on the Defendant's cross-examination of these witnesses.

On March 4, 2005, the Defendant began presenting its case by re-calling Mr. Priester, and calling Jeff Miller, the Defendant's Assistant Project Manager and Assistant Superintendent for the Project.

During the examination of Mr Priester, a dispute arose as to whether the Defendant had properly and timely disclosed two opinions of its expert witness, Mr. Lewis. These opinions related to two proposed repairs for the Jaramite panels and connections: a proposed repair designed by Juba Aluminum Products, Inc. ("Juba"), the Defendant's window subcontractor; and a proposed repair, referred to below as "the mechanical fix," developed by Mr. Lewis himself. The Panel concluded that the Defendant had failed to include either of these two proposed repairs in its expert witness

disclosure. <u>See</u> Plaintiff's Exhibit 40. However, rather than excluding this evidence (and over the objection of Plaintiff's counsel), the Panel postponed the Hearing to permit discovery of Mr. Lewis's latest proposed repairs. According to Chairman Goldberg:

> Mr. Lewis will be permitted when we resume in April to testify with regard to what I'll call the Juba mechanical fix and to the mechanical fix to which he referred in his deposition.... Counsel for Trammel Crow will be permitted to depose Mr. Lewis with regard to the Juba mechanical fix and this mechanical fix and will be entitled to depose Juba with regard to its calculation and its work with regard to what Mr. Lewis is positing as the Juba fix.

Plaintiff's Exhibit 1, Vol. 5, at 1291-1293. Chairman Goldberg stated that he wanted to "make it very clear that any opinions that anybody is going to render about anything in this case has to be made available by the 10th of April to the other side." <u>Id.</u> at 1295.

The Panel also decided at the conclusion of the First Hearing to permit both parties the opportunity to estimate "through either its own clients or outside estimators either or both of the Juba fix or the mechanical fix." <u>Id.</u> at 1293. The Panel required that all pricing estimates also be exchanged by April 10, 2005.

Finally, the Panel stated that it intended to take testimony at the resumption of the hearing ("the Second Hearing") from a representative of STO, a coatings manufacturer that the Defendant proposed using to repair the cracked Jaramite panels, and that the parties, or either of them, could depose the STO representative. Both parties subsequently deposed Chuck Knight, the STO representative chosen by the Defendant, in Atlanta, Georgia, and by agreement of counsel, the complete transcript of Mr. Knight's deposition was provided to the Panel for consideration prior to the Second Hearing.

On April 10, 2005, the parties exchanged pricing estimates. Shortly thereafter, the Plaintiff re-deposed Mr. Lewis and deposed John Juba, the owner of Juba Aluminum Products, Inc., which

designed one of Mr. Lewis's proposed repairs. The Defendant elected not to re-depose the Plaintiff's expert.

On April 22, 2005, however, and despite the Panel's instruction that all pricing estimates be exchanged 12 days earlier, the Defendant submitted a third pricing estimate to the Panel for consideration.

On April 26, 2005, the Panel began the Second Hearing, also held in Charlotte. At the start of the hearing, both parties moved to exclude various evidence. The Plaintiff moved to exclude the Defendant's untimely-served pricing estimate, and the Defendant moved to exclude certain opinions and related evidence submitted by the Plaintiff's rebuttal expert on April 10th. The Panel, however, denied both motions. As Chairman Goldberg explained:

> We will receive and consider all of the evidence that is going to be presented as respects the subject of the motions. In light of several factors, one and most importantly, is it relevant to the subject matter and will it tend to prove and disprove any claim or defense. We will also consider the time in which the information was created, the time or date in which it was furnished to the other side, and whether it was properly disclosed in accordance with the Panel's prior orders. All of those factors will be considered in determining the weight to be given to such evidence, but it will be received.

Plaintiff's Exhibit 1, Vol. 7, 1713-1714.

The Defendant then resumed presenting evidence by calling Mr. Lewis; Brent Long, the Defendant's in-house estimator; and Richard Rutherford, a cost estimator. The Defendant also presented numerous counter-designations of deposition testimony, including the depositions of the Project Architect (David Herring), the Project structural engineer (Craig Myers), and Trammel Crow's two key representatives (Don Deutsch and Dave Featherston), who managed the Project.

Upon completion of the Defendant's case, the Plaintiff re-called its expert, Mr. Sharff, in rebuttal, focusing primarily on alleged deficiencies in the Defendant's two new proposed repairs, and

also called two independent restoration contractors, Pat Lauro of Lesco Restorations, Inc.; and Mr. Heaner, both of whom had been deposed earlier by the Defendant. Both contractors provided several estimates of the costs of repairing the buildings using different proposed repairs and opined that the cost of repairs would be in the range of $18 million to $21 million. See Plaintiff's Exhibits 51 and 52.[5] The Plaintiff also submitted the affidavit of Doug Jones by agreement of counsel.

All of the deposition and affidavit testimony submitted by the parties was received without objection. See Plaintiff's Exhibit 1, Vol. 9, at 2548. In addition, the parties jointly agreed to the admission of over 250 exhibits.

Prior to closing arguments, the Panel instructed each party to submit by May 6, 2005 a detailed pricing analysis of the other party's pricing estimates to repair and/or replace the defective Jaramite panels and connections. The Panel also stated that it would permit the Plaintiff to submit by the same date the invoices of its expert witness for the costs of investigating the Jaramite problems at the Project. The Defendant requested an opportunity to respond to the invoices, which was granted by the Panel. Given the length of the two hearings, counsel for both parties agreed to limit their closing arguments to an hour-and-one-half each.

On May 6, 2005, each party submitted a brief analyzing the other party's pricing estimates to correct the defective Jaramite panels and connections. See Plaintiff's Exhibits 55 and 56. In summary, the Plaintiff contended that the Jaramite panels required replacement at a cost of between $18 and $21 million, while the Defendant maintained that the Panels could be repaired, through the methods identified by Mr. Lewis and/or Mr. Juba, for approximately $5 million, and that even if the panels required replacement, the cost was considerably less than the Plaintiff's estimates.

---

[5]The testimony of these witnesses is set forth in Plaintiff's Exhibit 1, Vol. 2, at 323-545, Vol. 3, at 555646, Vol. 8, at 2126-2321, and 2356-23601 (Sharff); Vol. 3, at 712-809 and Vol. 9, at 2534-2548 (Heaner); and Vol. 9, at 2405-2533:20 (Lauro).

Although the Plaintiff provided the Defendant with its expert's invoices prior to May 6, 2005, the Defendant never responded or submitted any objection to them.

On June 2, 2005, the Panel unanimously rendered an Award in favor of the Plaintiff and against the Defendant in the total sum of $13,911,321.05, which represents $13.5 million to replace the Jaramite panels, $402,696.05 for the costs of investigating the cracking problems, and $8,625.00, a portion of the Plaintiff's share of the cost of the arbitration proceeding. See Plaintiff's Exhibit 57 at 1-2. Specifically concerning damages, the Panel concluded that all of the panels must be replaced (a determination that the Defendant does not dispute in its present briefs), and stated that it had "carefully reviewed the damage estimates produced by both parties" and that $13.5 million represented "the Panel's evaluation of the evidence as to the fair and reasonable cost to remediate the defective conditions which are the contractual responsibility of the [Defendant]." Id. at 5.

On June 8, 2005, the Plaintiff filed its "Application for Confirmation of Arbitration Award as a Judgment of the Court Under 9 U.S.C. § 9," which is in the style of a complaint, but concerning the existence of federal subject matter jurisdiction, did not identify or state the citizenship of the members of the Plaintiff's limited partner, Cardinal Arrowpoint, LLC.

On August 3, 2005, the Defendant filed its "Answer ... and ... Motion to Vacate Arbitration Award" pursuant to §10 of the FAA.

On August 5, 2005, the Defendant filed a Motion to Dismiss for lack of subject matter jurisdiction, that is, the Plaintiff's failure to state fully the citizenship of Cardinal Arrowpoint's members.

On August 22, 2005, the Plaintiff filed its Response, including attachments establishing that Cardinal Arrowpoint's only member is the Board of Trustees of Stanford University, that the University was incorporated under California law and maintains its principal place of business in that

state, and that no member of the Board is a Georgia citizen.   See "Exhibit 1" to Document #21.

On September 2, 2005, the Plaintiff's filed its "Reply in Support of its Application for Confirmation of Arbitration Award and ... Opposition to Defendant's Motion to Vacate" (document #25), which, as previously noted, was the first brief filed by either party in support of their respective cross-motions to confirm/vacate the Award.

On September 7, 2005, the undersigned denied the Defendant's Motion to Dismiss. See "Memorandum and Order" (document #28) (concluding that citizenship of parties was diverse, and establishing schedule for remaining pleadings).

On October 7, 2005, the Defendant filed its "Brief in Support of Motion to Vacate ..." (document #31), raising only two issues: (1) whether the Panel "exceeded its authority" by conducting the arbitration and issuing an Award allegedly in the absence of a valid agreement to arbitrate between the Defendant and the Plaintiff, which was not a signatory to the Contract, and (2) whether the Panel demonstrated a "manifest disregard for the law" in its damages calculation.

On November 1, 2005, the Plaintiff filed its "Response in Opposition to Motion to Vacate ..." (document #34), and on November 15, 2005, the Defendant filed its "Reply in Support of Motion to Vacate ..." (document #35).

On November 17, 2005, the Plaintiff filed its "Motion to Strike Defendant's Reply" (document #36) and "Memorandum in Support ... " (document #37).   The undersigned has considered the Defendant's Reply, and, accordingly, will deny the Plaintiff's Motion to Strike.

After the Court informally granted them leave to do so, on November 29 and December 15, 2005, the Plaintiff and Defendant filed their respective "Sur-Repl[ies]" (documents ##39 and 40).

The parties' cross-motions to confirm or vacate the Arbitration Award  have been fully briefed as set forth above and are, therefore, ripe for determination.

## II. <u>DISCUSSION</u>

### A.  <u>Issue of Arbitrability</u>

The Federal Arbitration Act ("the FAA") provides that:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration... then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon <u>the court must grant such an order unless the award is vacated ... as prescribed in section 10 ... of this title</u>.

9 U.S.C. § 9 (emphasis added).  <u>Accord</u> <u>Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.</u>, 142

F.3d 188, 194 (4th Cir. 1998) ("because the appellant failed to qualify under any ground listed in ...

section ten ... of the FAA allowing the vacation ... of an arbitration award, the district court properly

confirmed that award").

Section 10(a)(4) of the FAA states that:

> [T]he United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration – where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(4).

In its first assignment of error, the Defendant contends that the arbitrators exceeded their

authority by arbitrating in the absence of a valid agreement to arbitrate between the Plaintiff and

Defendant, that is, that the Jaramite panel issue was not arbitrable in the first instance, because the

Plaintiff was not a signatory to the Contract.

Concerning arbitrability, the parties also dispute whether the Court must apply the highly

deferential standard of review, discussed below, that is otherwise applicable to review of an

arbitration award or, instead, conduct a <u>de novo</u> review.

As the Supreme Court has stated, the issue of *"<u>whether</u> a particular merits-related dispute*

15

is arbitrable" is a separate and distinct question from "<u>who</u> (primarily) should decide arbitrability." <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944-45 (1995) (when parties do not agree to arbitrate arbitrability, court should conduct "independent review" of that issue) (emphasis in the original). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." <u>Id.</u> at 944. It is not necessary, however, that the parties state in their contract that they agree to arbitrate the issue of arbitrability; rather, such an agreement may be established by the parties' conduct. <u>Id.</u> <u>Accord</u> <u>Rock-Tenn Co. v. United Paperworkers Intern. Union AFL-CIO</u>, 184 F.3d 330, 335 (4th Cir. 1999), <u>citing</u> <u>First Options</u>, 514 U.S. at 944-47.

The question of "who" decides arbitrability in this case is answered by the Fourth Circuit Court of Appeals' holding in <u>Rock-Tenn Co.</u> 184 F.3d at 335-36 (where party seeking to vacate arbitration award had "disputed ... in the arbitration proceedings ... 'whether' the dispute was arbitrable, but at no point ... dispute[d] 'who' could resolve that question," and otherwise voluntarily participated in arbitration process, including prearbtitration discovery, briefing, and lengthy arbitration hearing, arbitration panel properly decided issue of arbitrability). For the same reasons, the Defendant's conduct in disputing only <u>whether</u> the Jaramite panel issue was arbitrable, but not raising the further question of <u>who</u> could decide arbitrability – and, instead, voluntarily participating in an arbitration proceeding that lasted more than 26 months and involved voluminous discovery and briefing and a lengthy hearing – is clear and unmistakable evidence that the Defendant had agreed to arbitrate the issue of arbitrability. Accordingly, the undersigned will apply the deferential standard of review, discussed below, to the Defendant's assignment of error concerning arbitrability, as well as to the damages issue discussed in Section II.B. below.

It is well-settled that judicial review of an arbitration award is "among the narrowest known

to the law." Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union. 973 F.2d 276, 278 (4th Cir. 1992), quoting Union Pac. R.R. Co. v. Sheehan. 439 U.S. 89, 91 (1978). Accord  First Options, 514 U.S. at 942 ("court will set [arbitrator's] decision aside only in very unusual circumstances"); Westvaco Corp. v. United Paperworkers Int'l Union ex rel. Local Union 676, 171 F.3d 971, 974 (4th Cir. 1999) ("arbitration must be final to be effective. Permitting judicial second-guessing of arbitral awards would transform a binding process into a purely advisory one, and ultimately impair the value of arbitration");  Apex Plumbing Supply. Inc. v. U.S. Supply Co.. Inc.. 142 F.3d 188, 193 (4th Cir. 1998) ("review of an arbitrator's award is severely circumscribed"); and Remmey v. PaineWebber. Inc.. 32 F.3d 143, 146 (4th Cir. 1994) ("we must underscore at the outset the limited scope of review that courts are permitted to exercise over arbitral decisions").

An arbitrator's award is entitled to a "special degree of deference on judicial review," and "[e]very presumption is in favor of the validity of the award." Upshur Coals Corp. v. United Mine Workers of Am.. Dist. 3i, 933 F.2d 225, 228 (4th Cir. 1991).  Accord Champion Int'l Corp. v. United Paperworkers Int'l Union, 168 F.3d 725, 728 (4th Cir.1999) (the court "does not sit to hear claims of factual or legal error by an arbitrator, and must defer to the arbitrator as long as the arbitrator is even arguably construing or applying the contract").

In short, upon judicial review, the question is "whether the arbitrator did his job – not whether he did it well, correctly, or reasonably, but simply whether he did it." Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996).

Concerning an arbitration panel's application of the law, an arbitration award is enforceable "even if the award resulted from a misinterpretation of law, faulty legal reasoning or erroneous legal conclusion." Richmond. 973 F.2d at 281, quoting Upshur, 933 F.2d at 229.  It may be reversed only where the arbitrator "understand[s] and correctly state[s] the law, but proceed[s] to disregard the same

so that his decision reflects his personal notions of right and wrong." Id. at 281-82. Accord Remmey. 32 F.3d at 149 (arbitration panel's interpretation of law will not be reversed unless "arbitrators understand and correctly state the law, but proceed to disregard the same").

Moreover, "where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." United Paperworkers Int'l Union v. Misco. 484 U.S. 29, 38 (1987) (appellate court not free to refuse enforcement of the arbitrator's award even though it believed the arbitrator committed serious error).

Applying these principles to the record in this case, the Defendant has failed to establish that the Panel exceeded its authority when it found that the Defendant was bound by the arbitration agreement in the Contract. Indeed, the issue of arbitrability was squarely presented to the Panel, which considered, among other things, the Defendant's contention that the Plaintiff was not a party to the Contract containing the arbitration agreement, but clearly rejected that contention when it found that the parties had agreed to arbitrate the Jaramite panel dispute. See Arbitration Award, Plaintiff's Exhibit 57 at 1-2. In other words, the Panel "did its job," and resolved the issue of arbitrability. Accord Mountaineer Gas Co. v. Oil, Chem., 76 F.3d at 608.

The record is also clear that the Panel did not disregard the law or otherwise substitute its own notion of right and wrong when it concluded that the Plaintiff, a nonsignatory, could enforce the arbitration clause against the Defendant. Indeed, even assuming arguendo that the Court were to conduct an independent review of the question of arbitrability, clearly, the Defendant was bound to arbitrate.

The Federal Arbitration Act ("FAA") establishes a federal policy favoring the enforcement of written agreements to arbitrate. Specifically, the FAA provides that arbitration clauses "shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999). The FAA requires courts to compel arbitration in the event of a refusal to comply with a valid agreement to arbitrate. See 9 U.S.C. § 3.

As the Plaintiff correctly notes, the Supreme Court has instructed that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991), quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "Pursuant to that liberal policy, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability. " Moses H. Cone, 460 U.S. at 24-25. See also Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 710 (4th Cir. 2001); Long v. Silver, 248 F.3d 309, 315-16 (4th Cir. 2001); and O'Neil v. Hilton Head Hosp., 115 F.3d 272, 273-74 (4th Cir. 1997).

Concerning whether an otherwise valid and applicable arbitration clause may be enforced by a nonsignatory to the contract containing the arbitration provision, it is well settled that "the obligation and entitlement to arbitrate does not attach only to one who has personally signed the written arbitration provision." Washington Square Securities, Inc. v. Aune, 385 F.3d 432, 435 (4th Cir. 2004), citing International Paper Co., v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416. Rather, "[w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." Washington Square Securities, Inc., 385 F.3d at 435 (emphasis added). Accord Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d at 417, citing Thomson-CSF v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995); and Davidson v. Becker, 256 F.Supp.2d 377, 383

19

(D.Md. 2003).

In <u>Schwabedissen Maschinen & Anlagen GMBH</u>, the Fourth Circuit went on to state that:

state law determines questions concerning the validity, revocability, or enforceability of contracts generally, but the Federal Arbitration Act ... create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. <u>Because the determination of whether [the] nonsignatory [may enforce] the [general] contract presents no state law question of contract formation or validity, we look to the federal substantive law of arbitrability to resolve this question</u>.

206 F.3d at 417 (internal citations omitted; emphasis added).

The Fourth Circuit has repeatedly held that the issue of whether a nonsignatory may assert or be bound by an arbitration provision was a question of whether the party seeking to avoid arbitration had asserted any right or had received a "direct benefit" from the other party under the terms of the contract containing the arbitration provision. <u>Accord</u> <u>Brantley v. Republic Mortgage Ins. Co.</u>, 424 F.3d 392, 396 (4th Cir. 2005) (affirming denial of non-signatory's motion to compel arbitration because signatory plaintiffs "never attempted to rely on the contract [containing the arbitration clause]"); <u>R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n</u>, 384 F.3d 157, 160-61 (4th Cir. 2004) ("In the context of arbitration, the doctrine [of equitable estoppel] applies when one party attempts to hold another party to the terms of an agreement while simultaneously trying to avoid the agreement's arbitration clause"); <u>Long v. Silver</u>, 248 F.3d 309, 320 (4th Cir. 2001) (nonsignatory shareholder could not claim benefit of agreement between other shareholders without submitting to arbitration required by the same agreement); <u>United States v. Bankers Ins. Co.</u>, 245 F.3d 315, 323 (4th Cir. 2001) (nonsignatory could not seek direct benefit from contract while "simultaneously attempting to avoid the terms of an arbitration provision contained therein"); <u>and Schwabedissen Maschinen & Anlagen GMBH</u>, 206 at 418 ("nonsignatory is estopped from refusing to comply with an arbitration clause when it is seeking or receives a direct benefit from a contract

containing an arbitration clause").

Based on a record that clearly establishes that the Defendant received a substantial direct benefit under the Contract – that is, payments from the Plaintiff totaling in excess of $20 million dollars – it is estopped from avoiding the arbitration clause contained in the same agreement. Accord <u>Brantley</u>, 424 F.3d at 396; <u>R.J. Griffin & Co.</u>, 384 F.3d at 160-61; <u>Long</u>, 248 F.3d at 320; <u>Bankers Ins. Co.</u>, 245 F.3d at 323; <u>and</u> <u>Schwabedissen Maschinen & Anlagen GMBH</u>, 206 F.3d at 418.

This conclusion is further reinforced by other evidence presented by the Plaintiff, discussed above, establishing that while the buildings were under construction, the Defendant paid little heed to whether the Owner identified in the Contract was the Plaintiff TC Arrowpoint, L.P., the Plaintiff's sole general partner, Trammell Crow Arrowpoint, Inc., or their corporate parent, the Trammel Crow Company. Indeed, Ms. Harris testified that applications for progress payments were presented to the Trammel Crow Company. Similarly, Mr. Priester testified that he had no concern as to the precise identity of the Owner, so long as he dealt with Mr. Deutsch and Mr. Featherston, who were both employed by the Trammel Crow Company, not by one of its subsidiaries.

Accordingly, for these reasons, the Defendant's assignment of error that the Arbitration Panel exceeded its authority when it determined that the Jaramite panel dispute was arbitrable must and will be <u>overruled</u>.

### B.  Issue of Damages

In its remaining assignment of error, the Defendant contends that the Panel manifestly disregarded the law in its damages calculation, particularly in basing damages on the cost of repairs rather than the diminution in the value of the buildings or some other method.

Quite to the contrary, it is well established in North Carolina that the cost of repair measure of damages is the proper method to apply in complex construction cases where, as here, "the landowner will not get substantially what he bargained for unless he in fact gets the repair, replacement or completion." City of Charlotte v. Skidmore, Owings and Merrill. 103 N.C. App. 667, 682, 407 S.E. 2d 571, 580 (1991). In addition, the cost of repair measure of damages is appropriate where the contract contains a warranty against faulty materials or workmanship and the repairs are necessary to render the structure in conformance with the contract specifications. See, e.g., Butler & Sidbury. Inc. v. Green St. Baptist Church. 90 N.C. App. 65, 71, 367 S.E. 2d 380, 384-85 (1988) (when construction contract contains a guarantee against faulty materials or workmanship, "the measure of damages is controlled by the contract and the proper measure is the cost of repairs"); and Burke County Pub. Schs. Bd. of Educ. v. Juno Constr. Corp. 64 N.C. App. 158, 161, 306 S.E. 2d 557, 560 (1983) ("[t]he correct measure of damage in construction contract cases is the cost of repairing the structure to make it conform to contract specifications").

Applying these legal principles to the record in this case, the Court concludes that the Panel did not disregard the law in arriving at the amount of the Plaintiff's damages. The Contract expressly provides that in the event the buildings were not constructed as warranted, the Plaintiff's remedy would be to recover the cost of repairing the defect(s). See Contract, Paragraph 12.2.1, Plaintiff's Exhibit 7. The Panel conducted a nine-day hearing, which following the Defendant's concession that the Jaramite panels had, in fact, cracked, concerned almost exclusively the question of the Plaintiff's remedy and/or damages.

Moreover, when the Defendant sought to present, through its expert, Mr. Lewis, two additional repair estimates that had not been previously produced to the Plaintiff, rather than exclude that evidence, the Panel adjourned the Hearing for almost two months to allow the parties to conduct

additional discovery concerning those, and other, repair options and their estimated costs.  Prior to rendering its decisions, the Panel also allowed the parties to re-brief the repair/damages issue.

Finally, rather than merely accept the Plaintiff's alleged damages (between $18 and $21 million), the Panel awarded a lesser sum, specifically reciting in the Award that it had considered all of the parties' evidence concerning the cost of repair in reaching its conclusion that $13.5 million represented "the fair and reasonable cost to remediate the defective conditions  which are the contractual responsibility of the [Defendant]."  Id. at 5.

In short, the record establishes that the Panel "did its job" in determining the Plaintiff's damages, and, therefore, the resulting Award must be confirmed.  Accord  Misco, 484 U.S. at 38 ("where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect"); and Mountaineer Gas Co. v. Oil, Chem., 76 F.3d at 608 (essential question is "whether the arbitrator did his job-not whether he did it well, correctly, or reasonably, but simply whether he did it").

Accordingly, having established no grounds to vacate the Award, the Defendant's "Motion to Vacate Arbitration Award" must be denied, and the Plaintiff's "Application for Confirmation of Arbitration Award" granted.

### III.  <u>ORDER</u>

**NOW, THEREFORE, IT IS ORDERED:**

1.  The Plaintiff's "Motion to Strike Defendant's Reply" (document #36) is **DENIED**.

2.  The Defendant's "Motion to Vacate Arbitration Award" (document #15) is **DENIED**.

3.  The Plaintiff's "Application for Confirmation of Arbitration Award" (document #1) is **GRANTED**, that is, **JUDGMENT** in favor of Plaintiff TC Arrowpoint, L.P. is hereby **ENTERED** against the Defendant Choate Construction Co. in the principal amount of $13,911,321.05 with interest from this date at the rate allowed by law, as well as costs of court.

4.  The Clerk is directed to send copies of this Memorandum and Order and Judgment to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

**Signed: January 13, 2006**

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge